## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

MARIAM JIRON, individually and
as Parent and Next Friend of
J.G., a Minor, and E.G., a Minor,

       Plaintiffs,

       v.                                     Civ. No. 19-541 SCY/LF

SETH ROTH, in his individual
capacity, ANTOINETTE CARABAJAL,
in her individual capacity, and
CITY OF ALBUQUERQUE,

       Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART
## SUMMARY JUDGMENT[1]

     Plaintiffs Mariam Jiron and her minor children J.G. and E.G. bring this lawsuit for

unlawful search and seizure based on a child welfare check conducted inside Plaintiffs' home

without a warrant. Ms. Jiron further alleges that during the search Officer Sean Roth violated her

First Amendment rights when he threatened to arrest her in retaliation for her speech. The

defendant police officers Antoinette Carabajal and Sean Roth raise qualified immunity and move

for summary judgment. They argue that the initial encounter and subsequent search were

consensual and that no legal authority existed at the time of their search that would have put

them on notice that their conduct was illegal. With regard to Ms. Jiron's First Amendment claim,

Officer Roth asserts that he threatened to arrest Ms. Jiron because she was becoming agitated,

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all
proceedings and to enter an order of judgment. Docs. 3, 6, 7.

not because of anything she said and, in any event, no clearly established law existed to place him on notice that his conduct was illegal.

The Court concludes that none of the officers' conduct prior to commanding Ms. Jiron to open her apartment's front door violated Plaintiffs' rights. Under clearly established Tenth Circuit precedent and drawing all reasonable factual inferences in Plaintiffs' favor, however, Officer Roth seized Ms. Jiron when he ordered her to open her door. Because no legal justification existed for this seizure, it violated Ms. Jiron's Fourth Amendment rights and rendered invalid any subsequent consent to search that Ms. Jiron provided. Further, drawing all factual inferences in Ms. Jiron's favor, Officer Roth violated her First Amendment rights when he threatened to arrest her after she began to complain about the search that was taking place in her apartment. Because clearly established authority at the time did not exist to place the officers on notice that their specific conduct in this specific context would violate Ms. Jiron's First Amendment rights, however, qualified immunity shields Defendants from liability on the First Amendment claim. Finally, for the same reason the Court concludes Defendants are not entitled to summary judgment on some of their federal constitutional claims, the Court denies their motion for summary judgment on the state constitutional claims.

## FACTUAL BACKGROUND

On February 12, 2019 at 1:00 AM, Officer Antoinette Carabajal and Officer Sean Roth were dispatched to 220 60th St NW #A to perform a child welfare check on a New Mexico Children Youth and Families Department referral about an allegation of child abuse. Defendants' Undisputed Material Fact ("UMF") No. 1.[2] The allegation was that children located at the

---

[2] Defendants' Statement of Undisputed Material Facts are set forth in Doc. 59 at 4-8 and are undisputed unless otherwise noted.

address were using drugs or were around drug users in the home. *Id.* The original call came in at 10:20 p.m. Plaintiffs' Response to UMF No. 1.[3] Dispatch told the Defendant Officers that Ms. Jiron, the children's mother, had reported that her children were using some drug and no other information was given. *Id.*

At the address, Defendants entered the common courtyard and approached the apartment. UMF No. 2. They did not pass through any fences or gates between the common path and the front door. *Id.* The area in front of the apartment was not surrounded by any fencing or any other means of shielding it from view. *Id.* Plaintiffs purport to dispute this fact, but do not address the specific contentions Defendants set forth in their UMF, including whether "the area in front of the apartment" was surrounded by fencing. Doc. 69 at 5. Instead, Plaintiffs add that Ms. Jiron has blinds covering her windows. Plaintiff's Resp. to UMF No. 2.

The following UMFs (Nos. 3 through 13) describe events that are also depicted by footage from the officers' body cameras. When no party disputes the authenticity of a video and the video is so clear that no reasonable jury could adopt the nonmoving party's interpretation of the video, the Supreme Court has instructed that lower courts should "view[] the facts in the light depicted by the videotape" rather than accept the nonmoving party's interpretation of the facts. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Therefore, the Court examines the body camera footage itself, rather than accepting either party's version of events. To the extent the videos are unclear on a point, however, the Court draws all reasonable inferences in favor of Plaintiffs, the nonmoving party.

---

[3] Plaintiffs' Disputed Material Facts (that is, their response to Defendants' UMFs) are set forth in Doc. 69 at 4-12.

Between the first knock and Ms. Jiron arriving at the door, roughly 1 minute and 45 seconds passed. During this time, the officers knocked on the door or window four times and announced "police department" one time. Ms. Jiron opened the inner door of her apartment, leaving the outer metal security door closed. Both officers drew their guns when Ms. Jiron began to open her inner front door.[4] Officer Roth pointed his gun in the direction of Ms. Jiron for at least a second.[5] Officer Carabajal pointed her gun at the ground. Officer Carabajal yelled "police department," and Officer Roth repeated "police department" in a normal tone of voice. By the time Officer Roth repeated "police department," he had lowered his gun until it too was angled toward the ground. After Ms. Jiron greeted the officers and as Officer Roth was holstering his gun, he ordered her to "open the door please" in a professional but stern tone.[6] About a second later, Officer Carabajal holstered her weapon as well.

---

[4] The officers state they drew their guns because the sound of the door startled them, and they felt officer safety was compromised because they had loudly advertised their presence as police. Carabajal Aff., Doc. 59-1 ¶ 5; Roth Aff., Doc. 59-2 ¶ 6. The officers' subjective intent is not material to the question of whether Ms. Jiron was seized under the Fourth Amendment. *California v. Hodari D.*, 499 U.S. 621, 628 (1991) ("the test for existence of a 'show of authority' is an objective one"). Concerns of officer safety would be relevant to an excessive force claim, but Plaintiffs do not bring such a claim in this case.

[5] Ms. Jiron's affidavit states that Officer Roth "had his gun actually pointed at me." Jiron Aff., Doc. 69-2 ¶ 4(d). Officer Roth states that he drew his weapon and "held it by my side, intentionally out of view of the person behind the door." Roth Aff., Doc. 59-2 ¶ 6. The video shows Officer Roth, who is standing to the side of the door by the corner of the house, pointing his gun in front of him in the general direction of the front door. Although it appears from the video that Officer Roth may be pointing his gun at the place where someone coming out of the house would be at their first step, the video does not definitively exclude the possibility that he was pointing his gun at Ms. Jiron. In any event, and more relevant, the video does not exclude the possibility that Ms. Jiron could have reasonably perceived that Officer Roth was briefly pointing his gun at her.

[6] The parties dispute whether this is a request or a command. Defendants stress that Officer Roth's tone is neither elevated nor demanding. The Court agrees that the officer's tone is not elevated but does find it to be demanding. His stern tone and lack of questioning intonation would indicate to a reasonable person that he is giving a command. That Officer Roth had his

Ms. Jiron then partially opened the second, outer metal security door to her apartment. Officer Roth opened the door farther, stepped in front of Ms. Jiron and had a short conversation with Ms. Jiron while she was standing in her doorway. During this conversation, Ms. Jiron asks why she has to open the door and Officer Roth tells her "for the police." When Officer Roth tells her they are there to check on her children and Ms. Jiron asks why, Officer Roth responds in a slightly annoyed tone, "Well first of all, you're not answering the door when we're pounding on it" and asks her whether she heard the officers announcing that they were the police. Only then did Officer Roth say, "Would it be alright if we come in and chat with you?"[7] Ms. Jiron then slightly turns and moves back and Officer Roth begins to move forward into the apartment, followed by Officer Carbajal.[8]

---

gun out, even though he is holstering it while giving his command, bolsters Ms. Jiron's argument that she reasonably perceived Officer Roth as commanding her to open the door. Finally, Ms. Jiron's contention that it was an order draws support from the next bit of dialog ("What do I have to open the door for?"/ "For the police."). Viewed in the light most favorable to the nonmoving party, the Court finds a reasonable person could conclude Officer Roth ordered, not asked, Ms. Jiron to open her door.

[7] Officer Roth remembers saying "Mind if we come in and chat?" Doc. 59-2 ¶ 9. It is difficult to hear the beginning of this sentence on the recordings but the Court does not find the difference between Officer Roth's version and Plaintiff's version ("would it be all right if we come in and chat with you?") (Doc. 69, UMF 12 response) to be material.

[8] Officer Roth states that "Ms. Jiron responded by opening the door, stood aside, and held the door open for Officer Carabajal and me to enter." Roth Aff., Doc. 59-2 ¶ 9. Ms. Jiron, however, states that "When the male officer asked to come in, he did not even give me a chance to think or respond before he started walking into my house. Once he started moving in, I got out of his way." Jiron Aff., Doc. 69-2 ¶ 4(i).

The video shows Ms. Jiron initially opening the outer metal security door slightly, Officer Roth stepping forward, grabbing the door, slowly opening it further, and stepping forward, which places him outside the house, directly in front of the doorway and Ms. Jiron. When Officer Roth asks if they can come in and chat with her, Ms. Jiron slightly turns and steps back. It is not clear, however, whether Ms. Jiron begins to step back in response to Officer Roth beginning to move forward or whether Officer Roth begins to move forward in response to Ms. Jiron stepping back, as both Ms. Jiron and Officer Roth begin moving just as Officer Roth finishes his question.

The following table sets forth each event and the timestamp from each body camera:

| Exhibit 3 (Carabajal body camera) | Exhibit 4 (Roth body camera) | Event Depicted |
|---|---|---|
| 0:46 | 0:14 | Officer Carabajal's first knock on the door. It is not a loud knock, more of a rattle of the outer metal/screen door. |
| 1:08 | 0:34 | Officer Roth knocks[9] on the door. |
| 1:09 | 0:35 | Officer Roth says "police department" in a normal tone of voice. |
| 1:40 | 1:06 | Officer Carabajal knocks on something other than the door (likely a window). |
| 2:18 | 1:43 | Officer Carabajal knocks on something again (likely the door). |
| 2:30 | 1:59 | A sharp noise can be heard and Officer Roth immediately pulls his weapon. Initially, it is aimed in the area of the front door. At the same time, Officer Carabajal draws her weapon, but keeps it pointed at the ground. |
| 2:33 | 2:01 | Officer Carabajal yells "police department." Her gun is still pointed at the ground. |
| 2:39 | | Officer Roth's gun can be seen again. It is pointed at a 45-degree angle, somewhere between the door and the ground. |
| 2:40 | 2:08 | Officer Roth says "hey, police department" in a normal voice. Officer Carabajal raises her gun slightly, then lowers it again. |
| 2:43 | | Officer Roth lowers his weapon to point fully at the ground. |
| 2:44 | 2:11 | Officer Carabajal shines her flashlight on the door and Officer Roth repeats "police department" in a normal tone of voice. |
| 2:45 | 2:12 | Ms. Jiron says "hello yes." (It appears that the inner door is open, but the outer metal security door is not.) |

---

Although it appears to the Court that Ms. Jiron begins turning and moving backward just before Officer Roth begins moving forward, the video does not "clearly contradict" Ms. Jiron's version of events, and so the Court adopts her version as the nonmoving party.

[9] Ms. Jiron describes several of the knocks on the door as "pounding." This characterization is consistent with Officer Roth telling Ms. Jiron, "you're not answering the door when we're pounding on it." Although the Court does not characterize the knocks as rising to the level of a "pounding," the knocks were forceful, consistent with knocks intended to awaken a person in the middle of the night.

| 2:48 | 2:18 | As Officer Roth says, "Open the door please" he simultaneously holsters his weapon. His voice is not raised, but he uses the tone of a command. |
| | | Officer Carabajal also holsters her gun, which has stayed pointed at the ground. |
| 2:53 | 2:19 | The outer metal security door of the apartment opens about a foot and Ms. Jiron is visible. |
| 2:53-3:17 | 2:20-2:44 | The following conversation takes place. Neither person raises his or her voice, but Officer Roth's tone is stern and business like: |
| | | Ms. Jiron: "What do I have to open the door for?"[10] |
| | | Officer Roth: "For the police." |
| | | Ms. Jiron: "I understand that sir." |
| | | As Ms. Jiron is saying this, Officer Roth steps toward the outer metal security door and puts his left hand on it. |
| | | Officer Roth: "Hi, how are you doing, I'm Officer Roth with the Albuquerque Police Department." |
| | | As Officer Roth is saying this, he opens the outer metal security door wide enough for him to step directly in front of Ms. Jiron, just outside her doorway. |
| | | Ms. Jiron: "Yes." |
| | | Officer Roth: "We're here to check on you and your children." |
| | | Ms. Jiron: "Why?" |
| | | Officer Roth: "Well first of all, you're not answering the door when we're pounding on it." |
| | | Ms. Jiron: "No sir, the um, okay we're on Sixtieth Street in Albuquerque, there's a reason why I'm not gonna answer the door." |
| | | Officer Roth: "Did you hear me announcing that I was the police?" |
| | | Ms. Jiron: "And I had my CPAP on for my face…." |
| | | Officer Roth: "Those are like…" |
| | | Ms. Jiron: "So I'm just like…" |

---

[10] Ms. Jiron's affidavit indicates that she said, "What do I have to open the door for?" Jiron Aff., Doc. 69-2 ¶ 4(e). Although it is difficult to hear clearly what Ms. Jiron says, the video does not contradict her version of events. Therefore, the Court accepts this fact as she states it: Ms. Jiron asked what she has to open the door for, and Officer Roth answered "for the police."

| | | Officer Roth: "Okay."<br><br>Ms. Jiron: "I need to…"<br><br>Officer Roth: "Would it be alright if we come in and chat with you?" |
|---|---|---|
| 3:17 | 2:45 | Ms. Jiron turns her body and begins to move back as Officer Roth then begins to move forward into the apartment. |

After the officers entered the home, Officer Carabajal spoke with Ms. Jiron while Officer Roth proceeded down the hallway to look in the bedrooms. UMF Nos. 14-15. After Officer Roth came back, he and Officer Carabajal turned off their microphones while they had a short conversation. Roth Body Camera, Ex. 4 at 5:30-5:46. Afterwards, Ms. Jiron and Officer Carabajal went to the bedrooms, where Officer Carabajal briefly touched the two children's arms to check for evidence of drug use. UMF No. 16-18. Ms. Jiron objected to the officers' presence in her home at this point. UMF No. 19; *see also* Jiron Aff., Doc. 69-2 ¶ 4(m) ("[W]hen the officers went to start looking at my kids I started complaining because I really did not want them to do this to my kids. I told the officers I did not want them to be there in my house and I did not want them to search my kids."). Ms. Jiron's objections are not captured on the recordings because Officer Roth and Officer Carabajal apparently had not turned their microphones back on. As he began to address Ms. Jiron, however, Officer Roth turned his microphone back on and told Ms. Jiron to "change your tone," and "take a chill pill" and "you do need to" follow his orders because he could arrest her in front of her kids for interfering in an investigation of child abuse. *See* Roth Body Camera, Ex. 4 at 6:05-6:30. By the end of this discussion, Officer Roth had raised his voice and was yelling at Ms. Jiron. *Id.*; *see also* Jiron Aff., Doc. 69-2 ¶ 4(n) ("[Officer Roth] told me to stop complaining and having an attitude or he would arrest me and do it in front of my kids.").

Officer Roth completed the welfare check by looking in the refrigerator to ensure there was food for the children and testing the running water at the sink, and Officer Carabajal obtained Ms. Jiron's driver's license information. UMF Nos. 21-22. The officers left the apartment about 11 minutes after they entered it. UMF No. 24.

## PROCEDURAL HISTORY

Plaintiffs filed their Complaint on June 12, 2019, Doc. 1, and their Amended Complaint on June 19, 2019, Doc. 4.[11] The Amended Complaint brings claims for: Count I, "State Claims (Violation of Civil Rights, Trespass, and Battery)" brought against all defendants; Count II, "Fourth Amendment Claims (Unlawful Search and Seizure)" brought against both officer defendants; Count III, "First Amendment Retaliation Claim" brought against Officer Roth; Count IV, "Failure to Intervene" brought against both officer defendants; and Count V, "Negligent Supervision and Training" brought against the City of Albuquerque. *Id.* On October 9, 2019, the Court held a scheduling conference and entered a Scheduling Order setting discovery parameters and case management deadlines. Doc. 17. The parties proceeded to engage in written discovery. *See* Docs. 20, 24, 28, 36, 37, 42, 44, 46, 57.

On June 18, 2020, Defendants filed the present Motion for Summary Judgment, arguing that they are entitled to qualified immunity on Plaintiffs' claims for unlawful search and seizure, free speech retaliation, and failure to intervene. Doc. 59. They also argue they are entitled to summary judgment on Plaintiffs' state law tort claims. Doc. 59. Because Defendants raised qualified immunity, the Court stayed discovery pending resolution of the Motion for Summary Judgment. Doc. 63. Plaintiffs filed a Rule 56(d) motion, requesting an extension of time to

---

[11] With leave of the Court, Plaintiffs filed a redacted Second Amended Complaint on April 21, 2020, Doc. 51, but later withdrew it, Doc. 58.

respond to the Motion for Summary Judgment until Plaintiffs could depose the defendant officers. Doc. 62. The Court denied that motion, finding that the available video and audio evidence, as well as Ms. Jiron's own testimony, provided Plaintiffs with sufficient information to respond to the Motion for Summary Judgment. Doc. 68. The Court likewise found that "it appears that Plaintiffs seek to depose the defendant officers in the hopes of obtaining impeachment information rather than to obtain facts unknown to them that they cannot otherwise obtain." *Id.* at 7.

Accordingly, Plaintiffs responded to the Motion for Summary Judgment on July 28. Doc. 69. Defendants filed their Reply on August 11. Doc. 72. Briefing is complete and the motion is ready for decision.

## STANDARD OF REVIEW

A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted). In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted).

Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.* But, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322-23. When "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is "entitled to a judgment as a matter of law." *Id.* at 323. Therefore, "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). The movant may show an entitlement to summary judgment "simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Id.*

B.    Qualified Immunity

Qualified immunity protects public officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When an individual defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The plaintiff must show that 1) the officer violated a constitutional or statutory right and 2) the right was clearly established

when the alleged violation occurred. *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002). A court may address these prongs in either order, *Pearson*, 555 U.S. at 236, but a plaintiff must satisfy both to avoid qualified immunity, *Olsen*, 312 F.3d at 1304.

A right is clearly established if "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The action at issue need not have been previously declared unlawful, but its unlawfulness must be evident in light of preexisting law. *Beedle v. Wilson*, 422 F.3d 1059, 1069 (10th Cir. 2005). Unlawfulness is generally demonstrated "when there is controlling authority on point or when the clearly established weight of authority from other courts supports plaintiff's interpretation of the law." *Id.* at 1069-70 (internal quotation marks omitted).

The plaintiff bears the burden of identifying "a controlling case or robust consensus of cases" where an officer acting "under similar circumstances" to those faced by the defendants was found to have acted unlawfully. *D.C. v. Wesby*, 138 S. Ct. 577, 591 (2018); *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015). "In order for a law to be clearly established, there must be a Supreme Court or other Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains." *Moore v. Guthrie*, 438 F.3d 1036, 1042 (10th Cir. 2006) (internal quotation marks omitted). If no controlling authority is on point, the plaintiff must identify "a robust consensus of cases of persuasive authority." *Plumhoff v. Rickard*, 572 U.S. 765, 780 (2014) (internal quotation marks omitted); *Quinn*, 780 F.3d at 1013. The plaintiff "does not need to find a case with an identical factual situation." *Moore*, 438 F.3d at 1042. But the correspondence between settled law and the present case must be "substantial." *Quinn*, 780 F.3d at 1014.

In recent years, the Supreme Court "has issued a number of opinions reversing federal courts in qualified immunity cases." *White v. Pauly*, 137 S. Ct. 548, 551 (2017). "The Court has found this necessary both because qualified immunity is important to society as a whole, and because as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial." *Id.* (internal quotation marks and citations omitted). "[T]he defense of qualified immunity gives public officials the benefit of legal doubts." *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (internal quotation marks omitted). Thus, qualified immunity provides "ample room for mistaken judgments" and protects all but "the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 314, 343 (1986).

## DISCUSSION

### I. Looking Into A Home's Windows, While Standing In A Public Space, Is Not An Unlawful Search.

Plaintiffs argue that Officer Roth conducted an illegal search when approaching the home and looking in its windows. Doc. 69 at 12-13. Plaintiffs argue that "when a person takes the measure of preventing others from looking into their windows by putting closed blinds on them, an officer violates the Fourth Amendment when they peer through the cracks of the blinds to see inside the home." *Id.* at 13. Defendants' response is two-fold. First, they argue, the officers were not within the curtilage of the home when they approached, knocked on the front door, and looked in the windows. Doc. 59 at 9. Second, "[w]here the officers were not within the curtilage of the home, any visual observations they made were not a search." *Id.* at 10. Defendants are correct on both counts.

The undisputed facts show that Defendants did not enter the curtilage of Plaintiffs' home. "[C]urtilage questions should be resolved with particular reference to four factors: the proximity

of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). As discussed above, Plaintiffs do not dispute Defendants' facts showing that the officers entered a *common* courtyard to approach the apartment and that they did not pass through any fences or gates between the *common* path and the front door. UMF No. 2. The area in front of Plaintiffs' apartment was not surrounded by any fencing or any other means of shielding it from view. *Id.*

As Defendants argue, the Tenth Circuit found no entry into the curtilage of a home under nearly identical circumstances. In *Reeves v. Churchich*,[12] the Tenth Circuit found a yard in front of a duplex to be public space, because "although the front yard is in close proximity to the duplex, there is no evidence it (or any part thereof) is enclosed, is used for intimate activities of the home or is in any way protected from observation." 484 F.3d 1244, 1255 (10th Cir. 2007). "There is also no evidence the Reeves could exclude others from the yard and it appears they shared the yard with [the other occupants of the duplex]." *Id.* at 1254. "Thus, we conclude the front yard is not within the duplex's curtilage but rather is an 'open field.'" *Id.* at 1255 (citing *Dunn*, 480 U.S. at 304 ("[T]he term 'open fields' may include any unoccupied or undeveloped area outside of the curtilage. An open field need be neither 'open' nor a 'field' as those terms are used in common speech.")).

So too here: Defendants' facts show that they entered a shared courtyard, a shared path, and an area that was in no way fenced or protected from public observation. Plaintiffs failed to

---

[12] To avoid confusion with an unrelated Tenth Circuit case entitled *United States v. Reeves* that the Court analyzes later in this Opinion, the Court hereinafter refers to *Reeves v. Churchich* as *Churchich.*

present any facts disputing these contentions. The Court therefore finds Defendants did not enter the curtilage of Plaintiffs' home.

This take us to the second part of Defendants' argument: "[w]here the officers were not within the curtilage of the home, any visual observations they made were not a search." Doc. 59 at 10. Plaintiffs disagree with this argument, arguing that Ms. Jiron "has blinds covering her windows to shield the interior of her house from view" and that "it has been clearly established in the District of New Mexico that when a person takes the measure of preventing others from looking into their windows by putting closed blinds on them, an officer violates the Fourth Amendment when they peer through the cracks of the blinds to see inside the home." Doc. 69 at 5, 13.

Plaintiffs attempt to draw too much from the non-binding case they cite, *United States v. Christy*, 810 F. Supp. 2d 1219 (D.N.M. 2011). In *Christy*, the court found that a police officer (who had not entered the curtilage of the home) bending over and peering through cracks in otherwise closed window blinds conducted a search. *Id.* at 1259. The court reasoned that the "activities inside [the] residence were not clearly visible—instead, [the officer] had to crouch down and peer through the small crack." *Id.*

To the extent *Christy*'s conclusion is dependent on a finding that the officer there assumed an extraordinary vantage point that enabled the officer to see into an otherwise obscured window, no evidence exists that the officers in this case did the same. *See Christy*, 810 F. Supp. 2d at 1258 ("when police surveillance takes place at a position which cannot be called a 'public vantage point,' i.e., when the police—though not trespassing upon the defendant's curtilage—resort to the extraordinary step of positioning themselves where neither neighbors nor the general public would ordinarily be expected to be, the observation or overhearing of what is occurring

within a dwelling constitutes a Fourth Amendment search." (quoting LaFave, *Search and Seizure*, § 2.3 (4th ed. 2004)). Thus, even if the Court were to accept *Christy*'s conclusion that whether an officer has to bend down to look through a crack in the blinds is relevant, no evidence exists that the officers here had to take an unusual position to peer through a crack in Plaintiffs' blinds.

To the extent that the officer bending down was not a critical factor in *Christy* and so, as Plaintiffs argue, *Christy* simply says police cannot legally look through a crack in the blinds, the Court disagrees with *Christy*. The Tenth Circuit in *Churchich* held that the "mere visual observation of objects or people inside the [home] through [an open] bedroom window from the front yard [i]s not a search under the Fourth Amendment." *Churchich*, 484 F.3d at 1255. Importantly, the Tenth Circuit directed lower courts in cases such as this to ask whether the officers' conduct was limited to "mere visual observation," or, instead, if they engaged in actions that "revealed information that could not have been obtained by visual observation alone." *Id.* at 1258. The Tenth Circuit further made clear that "visual observation alone" from a "public vantage point" is not a search. Thus, in *Churchich* it did not matter that the open window was covered in metal bars and foliage. *Id.* at 1258 n.20. In the present case, Plaintiffs make no allegation that the officers engaged in actions that "revealed information that could not have been obtained by visual observation alone." Instead, what they saw through the window was the product of "mere visual observation" obtained from a public vantage point. Thus, under *Churchich*, the officers did not violate Plaintiffs' Fourth Amendment rights when they looked into the window of their apartment.

Further support for this conclusion comes from one of the same Supreme Court cases that *Churchich* relied on, *California v. Ciraolo*, 476 U.S. 209 (1986). In *Ciraolo*, police suspected a

man named Ciraolo of farming marijuana in a back yard that was surrounded by a 6-foot outer fence and a 10-foot inner fence. *Id*. at 209. To view the back yard, police secured a private plane and flew over the house. *Id*. Emphasizing the presence of the two fences and their height, the California Court of Appeals concluded that evidence in the criminal case against Ciraolo should be suppressed because the aerial surveillance constituted "a direct and unauthorized intrusion into the sanctity of the home." *Id*. at 210.  The California Supreme Court denied certiorari and the case went to the United States Supreme Court where Ciraolo made an argument similar to the one Plaintiffs now make. *Id*.

Specifically, Ciraolo contended "he has done all that can reasonably be expected to tell the world he wishes to maintain the privacy of his garden within the curtilage without covering his yard." *Id*. at 211. The State, on the other hand, analogized "its mode of observation to a knothole or opening in a fence: if there is an opening, the police may look." *Id*. at 210. The Supreme Court sided with the State, holding that "the mere fact that an individual has taken measures to restrict some views of his activities [does not render unconstitutional] an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible." *Id*. at 213. Similarly, even though Plaintiffs put up blinds to increase their privacy, the officers saw what they saw from a public vantage point. Their view into Plaintiffs' home, therefore, did not violate the Fourth Amendment.[13]

Moreover, even if the officers' conduct was unconstitutional, no controlling authority existed at the time to put them on notice that their conduct would be illegal. Plaintiffs only cite

---

[13] Defendants argue in their Reply that "Plaintiffs make no argument that Officer Carabajal violated their Fourth Amendment rights by peering through their windows, therefore, this claim as it applies to Officer Carabajal must be dismissed." Doc. 72 at 4 n.1. Because the Court concludes that looking into the windows was not unconstitutional, regardless of who did it, the Court need not address this argument.

one case in support of their argument: *Christy*. District court cases are not binding authority and generally do not clearly establish the law for qualified immunity purposes. *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (district courts do not make precedent, and many courts of appeals therefore decline to consider district court decisions when determining if constitutional rights are clearly established for the purposes of defeating qualified immunity); *Ullery v. Bradley*, 949 F.3d 1282, 1300 (10th Cir. 2020) ("[W]e decline to consider district court opinions in evaluating the legal landscape for purposes of qualified immunity.").

In the absence of controlling authority, the Court asks whether the courts that have addressed this issue constitute a robust consensus of cases that constitute persuasive authority. *D.C. v. Wesby*, 138 S. Ct. 577, 590-91 (2018) (speaking of "controlling authority" *or* "a robust consensus of cases of persuasive authority" (internal quotation marks omitted)). The Court's research has found several cases that find the act of peering through a partially covered window is a search, but these cases did so after determining that the officers had entered the curtilage of the home. *United States v. Duncan*, No. 20-cr-49, 2020 WL 5801079, at *5 (E.D. Ky. Sept. 29, 2020); *United States v. Fuentes*, 800 F. Supp. 2d 1144, 1152-53 (D. Or. 2011); *Canny v. Bentley*, 307 F. Supp. 3d 940, 947-51 (N.D. Iowa 2018).[14] *Christy* is the *only* case that Plaintiffs have cited, or that the Court has found, which holds that the mere act of bending down to peer through cracks in window blinds, while standing in an open field and not the home's curtilage, is a search.

---

[14] The distinction is highly relevant because "an open field, unlike the curtilage of a home, is not one of those protected areas enumerated in the Fourth Amendment." *United States v. Jones*, 565 U.S. 400, 411 (2012) (citation omitted). The Court would likely side with Plaintiffs if Plaintiffs had shown that Officer Roth entered the curtilage of the home in order to peer in through the window. *See Florida v. Jardines*, 569 U.S. 1, 5-6 (2013) (police officers may not "gather[] information" in the "curtilage of the house" by "physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner").

The law is not clearly established by means of one district court decision. Therefore, Plaintiffs' claim that Defendants illegally searched their apartment by looking in the windows when they first approached the apartment fails at both prongs of the qualified immunity analysis.

## II.   Defendants Are Not Entitled To Qualified Immunity On Plaintiffs' Illegal Seizure Claim.

Plaintiffs argue that Ms. Jiron was seized while inside her home because of the officers' coercive conduct. Doc. 69 at 13-15. They argue that because the officers pounded on the door, announced that they were police, ordered her to open the door, and drew and brandished their firearms, a reasonable person would not believe that she was "free to leave" or terminate the encounter by ignoring the officers and closing the door on them. *Id.* Defendants argue that their conduct was not coercive because "the officers did not make demands or direct commands, but rather used a conversational, not coercive tone." Doc. 59 at 17. Drawing all reasonable factual inferences in Plaintiffs' favor, the Court concludes the officers unconstitutionally seized Ms. Jiron. The Court also finds that the law on point is clearly established.

### A.   The officers violated the Fourth Amendment.

In *Payton v. New York*, the Supreme Court held that, "[i]n terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." 445 U.S. 573, 590 (1980) (emphasis added).[15] "In no [setting] is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home—a zone that finds its roots in clear and specific constitutional terms." *Id.* at 589 (quoting U.S. Const. amend. IV).

---

[15] No party argues that exigent circumstances existed to enter the home.

Yet, it is equally well established that police officers may approach a home and knock on a person's door with the hope of initiating a consensual encounter for investigatory purposes. "When law enforcement officers who are not armed with a warrant knock on a door, they do no more than any private citizen might do." *Kentucky v. King*, 563 U.S. 452, 469 (2011); *id.* at 463 ("officers may seek consent-based encounters if they are lawfully present in the place where the consensual encounter occurs"). "This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Florida v. Jardines*, 569 U.S. 1, 8 (2013). "And whether the person who knocks on the door and requests the opportunity to speak is a police officer or a private citizen, the occupant has no obligation to open the door or to speak." *King*, 563 U.S. at 469-70. "And even if an occupant chooses to open the door and speak with the officers, the occupant need not allow the officers to enter the premises and may refuse to answer any questions at any time." *Id.* at 470.

The Supreme Court has ruled that a person standing in the open doorway to her home is in a "public" place for purposes of the Fourth Amendment. *United States v. Santana*, 427 U.S. 38, 40-41 (1976). However, this reasoning does not extend to a person's involuntary presence in her own doorway. As the Tenth Circuit has held, "if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *United States v. Reeves*, 524 F.3d 1161, 1167 (10th Cir. 2008). "Opening the door to one's home is not voluntary if ordered to do so under color of authority." *Id.*

A person is "seized" within the meaning of the Fourth Amendment if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [s]he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Circumstances

that indicate a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.*

The question in this case is therefore whether the encounter at Ms. Jiron's doorstep was a consensual "knock-and-talk investigation," or whether Ms. Jiron "was seized inside [her apartment] and opened the door as a result of coercive police conduct." *Reeves*, 524 F.3d at 1167. Drawing all reasonable factual inferences in Ms. Jiron's favor, the Court concludes that a reasonable person in her situation would have believed she was not free to terminate the encounter with the officers.

To begin with, the 1:00 a.m. knocking came in "the dead of night." In *Reeves*, the Tenth Circuit quoted the Seventh Circuit with approval to emphasize the importance of this factor in the coerciveness analysis:

> Because our law and legal traditions long have recognized the special vulnerability of those awakened in the night by a police intrusion at their dwelling place, our Fourth Amendment jurisprudence counsels that, when a knock at the door comes in the dead of night, the nature and effect of the intrusion into the privacy of the dwelling place must be examined with the greatest of caution.

524 F.3d at 1169 n.7 (quoting *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997)).

Moreover, once Ms. Jiron did open the inner door to her apartment, she was confronted with two police officers brandishing their firearms—one pointed in her general direction—and one officer yelling "police department." Another officer instructed her to "open the door please." She obeyed, by opening the outer metal security door to her apartment about a foot. When she asked why she *had to* open the door, Officer Roth told her, "for the police." Officer Roth then stepped forward, put his hand on the outer metal security door and opened it further so that he could step directly in front of Ms. Jiron. He then scolded her for not answering the door sooner. This conduct is sufficient to transform a consensual knock-and-talk investigation into a seizure.

21

Defendants argue that they did not "threaten or coerce" Ms. Jiron. Doc. 72 at 6. The Court agrees Defendants did not verbally threaten Ms. Jiron. But drawing all factual inferences in Ms. Jiron's favor, two police officers banged on her door in the dead of the night, one ordered her to open her door, both had their guns drawn, and one had his gun pointed in her general direction. These circumstances would cause a reasonable person to feel threatened. Moreover, these circumstances are sufficient to transform a consensual encounter into an involuntary one. *Cf. United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (relevant factors include the display of a weapon by an officer or the use of language or tone of voice indicating that compliance with the officer's request might be compelled).

Defendants argue that the Court should not consider their repeated knocking because Ms. Jiron's own words demonstrate that she did not feel coerced by the knocking. *See* Doc. 59 at 18, Doc. 72 at 7. It is true that when Officer Roth chastised Ms. Jiron for not answering the door sooner, she explained that she did not hear the initial knocking. Because Ms. Jiron did not even hear the initial knocks, Defendants assert, she could not have felt coerced by them. But "the test for existence of a 'show of authority' is an objective one." *California v. Hodari D.*, 499 U.S. 621, 628 (1991). Under this reasonable-person standard, the relevant question is not how the repeated knocking made Ms. Jiron feel, but how such knocking would make a reasonable person feel.

Defendants also argue that the two officers knocked intermittently, not continuously, on Ms. Jiron's door and only occasionally announced "police department." Doc. 72 at 7. The body cameras support this contention. Over a minute and a half, the officers knocked four times and said "police department" once before Ms. Jiron opened the inner door to her apartment. Tenth

Circuit precedent lends support to Defendants' argument that the knocking and occasional announcement of "police department" was not in itself coercive.

The Tenth Circuit has "decline[d] to place a specific time limit on how long [the police] can knock before exceeding the scope of this implied license" to approach a person's front door and initiate a consensual encounter. *United States v. Carloss*, 818 F.3d 988, 998 (10th Cir. 2016). In *Carloss*, the court found that "several minutes" of knocking was not coercive. But there, police officers approached the house in the afternoon, not at night, and did not announce that they were police during the knocking. *Id.* at 990-91. And "[t]he officers were no doubt encouraged to remain a bit longer, hoping someone would respond to their knock, because they heard movement inside the house and received no request from inside the house to depart." *Id.* at 998. Thus, although *Carloss* does lend support to Defendants' argument, its conclusion may not apply when a minute and a half of knocking comes in the middle of the night with no sign from within the house that provides police encouragement to stay, and when the knocking is coupled by the occasional announcement of "police department."[16]

The Court, however, need not decide whether the knocking and announcing of "police" were alone enough to constitute a seizure because the Court does not view these factors in isolation. More important than the knocking and announcement of police is the drawing of the guns, the order for Ms. Jiron to "open the door please," and the response to her question about why she has to open the door ("for the police").[17] The question before the Court is whether Ms.

---

[16] No reasonable officer reading *Carloss*, however, would be on clear notice that the knocking and announcing of "police" in this case, when viewed in isolation, was unconstitutional.

[17] Officer Carabajal, who did not order Ms. Jiron to open the door, does not argue that she has no constitutional liability because she did not sufficiently participate in the seizure. She argues only that Ms. Jiron was not seized.

Jiron was illegally seized at any point before the officers entered her home, not whether she was seized solely due to the minute or two of knocking.

Defendants likewise point out that "[t]he tone in which Officer Roth conversed with Ms. Jiron was conversational and not demanding." Doc. 72 at 7. The Court agrees that, prior to entering the apartment, Officer Roth did not raise his voice and that his overall conduct was professional. This, however, does not change that facts that he ordered Ms. Jiron to open the door; when she slightly opened it, he put his hand on it and opened it further; he told her "for the police" when she asked why she had to open the door; he indicated to her that one reason the officers needed to check on her children was that she was not answering the door when police officers were "pounding" on it; and he questioned her about whether she heard the officers announcing that they were the police. In other words, even where a police officer acts professionally and does not raise his voice, his words and conduct can cause a person to reasonably believe she "is not free to decline the officers' requests or otherwise terminate the encounter." *Reeves*, 524 F.3d 1161 (quoting *Florida v. Bostick*, 401 U.S. 429, 436 (1991), and setting forth appropriate inquiry in "situations where the individual could not or would not wish to leave, even absent police presence").

      B.      <u>The law is clearly established.</u>

In support of their contention that the right at issue is clearly established, Plaintiffs cite two cases: *Reeves* and *United States v. Flowers*, 336 F.3d 1222 (10th Cir. 2003). While these cases are not factually identical to the present case, the Court concurs that the correspondence between these precedents and the present case is "substantial" and that they would have put every reasonable officer on notice that the conduct in this case violated the Fourth Amendment. *Cf. Quinn v. Young*, 780 F.3d 998, 1014 (10th Cir. 2015).

In *United States v. Flowers*, the police were investigating allegations that someone was selling liquor illegally from his home. 336 F.3d at 1223. The police set up a sting operation. While two officers watched the back door of the home, two officers approached the front door, knocked, and pretended to be interested in procuring alcohol. *Id.* at 1224. The defendant did not open the door; he spoke to the officers through a closed door and handed the officers a bottle of wine through "a panel adjacent to the front door." *Id.* "An officer then said, in a firm tone of voice, 'Tulsa Police Department, open the door.'" *Id.* The defendant opened the door after approximately 15 to 25 seconds. *Id.* The officers entered the home and arrested him. *Id.*

The Tenth Circuit found that this violated the Fourth Amendment, absent exigent circumstances to enter the home. *Id.* at 1227. That is because the defendant was in his home when he was arrested and did not lose the constitutional protection of privacy inside his home by passing a bottle outside a hole in his wall. *Id.* Further, and crucially for purposes of the present case, the Tenth Circuit found that the defendant's decision to open his door to allow the police to enter was "not voluntary." *Id.* at 1226 n.2. That is because "a reasonable person confronted by police officers outside his door at night and a command by one of the officers to allow them to enter, would have believed that he had to open the door of his home and submit to the show of authority." *Id.*

The Court agrees that *Flowers* is clearly established law on point with this case. Drawing all reasonable factual inferences in her favor, Ms. Jiron was (1) confronted by two police officers outside her door with weapons drawn, (2) at night, and (3) received a command by one of the officers to "open the door please" in a firm tone of voice.[18] Under *Flowers*, it is clearly

---

[18] The parties dispute whether "open the door please" was a request or a command. Construing the facts in the light most favorable to the nonmoving party, the Court made a finding that this is a command under the totality of the circumstances. *Supra*, note 6.

established that Ms. Jiron's decision to open the door and submit to the officers' authority was not voluntary.

In *United States v. Reeves*, police officers were investigating an aggravated assault. 524 F.3d at 1164. The officers suspected a person who was living in a hotel room at the time. *Id.* The officers arrived at the hotel at 2:43 a.m. *Id.* The hotel manager made multiple phone calls to the defendant's room, but he did not answer any of them. *Id.* Three officers approached the hotel room while one officer went to the back of the hotel to watch the rear exit. *Id.* The officers knocked on the doors and windows of the motel room, yelling and identifying themselves as police officers. *Id.* After approximately twenty minutes of banging and yelling, the defendant came to the motel room door. *Id.* The defendant opened the door, stepped out of the room, and the officers arrested him. *Id.*

Relying on *Flowers*, the Tenth Circuit reiterated that "if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home." *Reeves*, 524 F.3d at 1168. The majority acknowledged that the case was not identical to *Flowers* because the officers did not give the defendant a direct order to open his hotel door. *Id.* Nonetheless, the court held that "the officers' actions were effectively a command to open the door." *Id.* The following factors demonstrated coerciveness: (1) three officers (2) pounded on the defendant's door and window (3) while yelling and loudly identifying themselves as police officers (4) for at least twenty minutes (5) between 2:30 and 3:00 in the morning. *Id.* at 1168-69. "A reasonable person faced with several police officers consistently knocking and yelling at their door for twenty minutes in the early morning hours would not feel free to ignore the officers' implicit command to open the door." *Id.*

In looking to *Reeves*, the Court acknowledges that, unlike the present case, *Reeves* deals with an *implicit* command to open the door. That implicit command was the product of more yelling and knocking for a much longer time: Multiple officers loudly yelled and knocked in the "dead of night" for twenty minutes on a motel room door (which was presumably close to where Reeves would have been inside the motel room). Yet other aspects of the conduct of Defendant Officers in the present case were *more* coercive than the conduct of the officers in *Reeves*: Here, Officer Roth issued an explicit command to open the door; both officers had their firearms drawn; one of these firearms was pointed in Ms. Jiron's general direction; and when questioning why she *had* to open the door, Officer Roth told her "for the police" and then admonished her for not opening the door more quickly.

Moreover, *Reeves*'s statement of the law serves to place officers on notice that, without a warrant or exigent circumstances, they cannot constitutionally require a person to open the door to their home. *Id*. at 1166 n.4, 1167 (in deciding whether, in the absence of exigent circumstances or a warrant, there was an unconstitutional seizure "the question is only whether Reeves voluntarily opened his door" and "[o]pening the door to one's home is not voluntary if ordered to do so under color of authority"). Thus, when a police officer uses his color of authority to require a person to open the door to her home, that police officer seizes the homeowner. *Id*. at 1166 ("This court has held that officers need not physically enter the home for *Payton* to apply . . . *Payton*'s protections apply to all Fourth Amendment seizures of persons inside their homes" and "this court has held that if an individual's decision to open the door to his home to the police is not made voluntarily, the individual is seized inside his home."). This seizure occurs regardless of whether police had reasonable suspicion or probable cause to believe the home contained evidence of a crime. *Id*. ("labeling an encounter in the home as either an

investigatory stop or an arrest is meaningless because *Payton*'s requirements apply to all seizures"). These quotes from *Reeves* place police officers on notice that, absent exigent circumstances or a warrant, requiring a homeowner to open her door "for the police" is an unconstitutional seizure.

And to the extent that a robust consensus of cases in other circuits is instructive, the Court finds ample support for its conclusion that any reasonable officer would have known that this encounter effected an involuntary seizure inside Ms. Jiron's home. *United States v. Jerez*, 108 F.3d 684, 691-93 (7th Cir. 1997) (knocking on a motel room door for three minutes in the middle of the night while declaring themselves police officers); *United States v. Conner*, 127 F.3d 663, 665-66 (8th Cir. 1997) (four officers knocked on defendants' motel door three times, identified themselves as police, and demanded that the defendants "open up"); *cf. United States v. Mowatt*, 513 F.3d 395, 399-400 (4th Cir. 2008) (when the officers pounded on the door, announced they were the police, and ordered the defendant to open the door, the act of opening the door, permitting officers to gain visual access to the apartment, was a search under the Fourth Amendment), *abrogated on other grounds by Kentucky v. King*, 563 U.S. 452, 464-65 (2011).

Because the Defendant Officers violated the Fourth Amendment and because published Tenth Circuit precedent existing at the time provided clear notice that their conduct would violate the Fourth Amendment, Defendants are not entitled to qualified immunity on Plaintiffs' claim that Ms. Jiron was seized while inside her home.

## III.  Defendants Are Not Entitled To Qualified Immunity On Plaintiffs' Warrantless Search Claim.

The parties agree that the police officers entered the home and searched it without a warrant. Defendants move for qualified immunity on Plaintiff's claim of illegal search, arguing that Ms. Jiron's act of stepping away from the door when Officer Roth asked to come in

demonstrated that she consented to the search of her home. Doc. 59 at 10-13. The Court

disagrees, and finds that the facts, viewed in the light most favorable to Plaintiffs, show that the

officers violated Ms. Jiron's clearly established rights.

> A.    The officers violated the Fourth Amendment.

"A warrantless search of a [person's] home is per se unreasonable under the Fourth

Amendment unless the government can show that it falls within one of a carefully defined set of

exceptions." *United States v. Cos*, 498 F.3d 1115, 1123 (10th Cir. 2007) (internal quotation

marks omitted). "Consensual searches constitute one exception to the warrant requirement." *Id.*

at 1124. Defendants point out that courts have frequently held that "[i]mplied consent arises

when a person takes some actions that would lead a reasonable officer to believe that consent had

been extended." Doc. 59 at 11. Under ordinary circumstances, a person who knows the officers

wish to enter his home and allows them to enter without any sign of refusal, has impliedly

consented to a search of the home. *United States v. Jones*, 701 F.3d 1300, 1319-21 (10th Cir.

2012).

In their response, Plaintiffs do not dispute that Ms. Jiron stepped away from her door to

allow the officers to enter without any verbal protests. Doc. 69 at 15-16. They assert, however,

that Ms. Jiron was not given an opportunity to protest because "Defendant Roth started walking

into the home before Ms. Jiron could give any permission for him to enter." *Id.* at 17. As

explained above, *supra* note 8, the Court drew all reasonable inferences in Plaintiff's favor and

found that, when Officer Roth asked to come in, he did not give Ms. Jiron "a chance to think or

respond before he started walking into" the apartment. Jiron Aff., Doc. 69-2 ¶ 4(i). Once Officer

Roth started moving in, Ms. Jiron got out of his way. *Id.*

The Court's rejection of Defendants' argument, however, does not turn on whether Ms.

Jiron impliedly gave consent for Officer Roth to enter her apartment when she stepped back from

the doorway. Plaintiffs do not develop a lack-of-implied-consent argument and so the Court does

not analyze this issue. Instead, Plaintiffs argue that, *assuming there was implied consent*, it was

invalid because it closely followed an illegal detention. Doc. 69 at 15-16. Having already found

that Ms. Jiron's detention was illegal, the inquiry the Court must now consider is whether this

illegal detention tainted her alleged implied consent.

"When a consensual search follows a Fourth Amendment violation, the government must

prove both (1) that the consent was voluntary under the totality of the circumstances, and (2) that

there was a break in the causal connection between the illegality and the evidence thereby

obtained." *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010). As explained above, the

Court assumes the consent was voluntary for purposes of this motion and proceeds to prong two.

"[T]he Supreme Court articulated three factors especially relevant to th[is second prong]: 1) the

temporal proximity between the police illegality and the consent to search; 2) the presence of

intervening circumstances; and particularly 3) the purpose and flagrancy of the official

misconduct." *Id.* at 1259-60 (citing *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975)) (internal

quotation marks omitted). The first two factors clearly favor Plaintiffs. The third factor is more

difficult, but the Court concludes on the strength of the Tenth Circuit's opinion in *Fox* that it also

favors Plaintiffs.

First, a "close temporal proximity weighs against a finding of attenuation." *Fox*, 600 F.3d

at 1260. Here, Ms. Jiron stepped back to let the officers enter the apartment just over a minute

after Officer Roth pointed his firearm in her general direction; he ordered her to open the door;

she submitted to the show of authority by slightly opening the outer metal security door of her

apartment; and Officer Roth grabbed the door and opened it further. These events are *very* close

in time. In *Fox*, the Tenth Circuit collected cases holding that thirty to forty-five *minutes* is not

30

enough time to purge the taint of an illegal seizure. *See* 600 F.3d at 1260. Similarly, in *Utah v. Strieff*, the Supreme Court noted: "Our precedents have declined to find that this factor favors attenuation unless 'substantial time' elapses between an unlawful act and when the evidence is obtained." 136 S. Ct. 2056, 2062 (2016). Because only minutes had elapsed between the time police stopped Strieff without reasonable suspicion and the time they found drugs on him, the Supreme Court weighed this factor against the police officers who searched Strieff. *Id*. Given this precedent, the first factor weights against the officers in this case.

Second, Defendants have not met their burden to demonstrate intervening circumstances showing voluntariness. Circumstances that show voluntariness include carefully explaining a consent form and advising an individual of the right to withhold consent, a release from custody, an appearance before a magistrate judge, or consultation with an attorney. *Fox*, 600 F.3d at 1260 (collecting cases). During the twenty-seven seconds that elapsed between Officer Roth ordering Ms. Jiron to open the outer metal security door and the time he entered the apartment, Ms. Jiron questioned why she had to open her door and Officer Roth responded, "for the police"; Officer Roth then grabbed the security door, opened it wider, and stepped directly in front of Ms. Jiron; when he informed her that they were there to check on her children and she asked "Why?" the only justification he provided was "you're not answering the door when we're pounding on it"; and when Ms. Jiron explained that she did not answer the door because she lives in a high crime area, Officer Roth cross-examined her by asking "Did you hear me announcing that I was the police?" Rather than dissipating any show of his authority after Ms. Jiron slightly opened her door, Officer Roth's actions leading to his entry of the apartment added to it. As a result, this interaction does not constitute an intervening cause sufficient to meet the government's heavy

burden of showing that the primary taint of the violation (that occurred less than a minute earlier) was purged.

Under the third factor, "purposeful and flagrant misconduct is generally found where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up." *Fox*, 600 F.3d at 1261 (internal quotation marks omitted). "Additionally, it may be significant that the officers had no right whatsoever to detain the person from whom consent is sought." *Id.* (internal quotation marks omitted).

This third factor is less straightforward than the previous two factors. The officers went to the apartment in response to a CYFD referral rather than as part of a criminal investigation. Although they likely would have acted on any criminal violation they observed during their welfare check, they primarily went into the apartment to make sure the children were safe, as Ms. Jiron had reported that her children were using drugs or were around drug users in the home. *See* Doc. 69 at 4, Plaintiffs' Response to UMF 1. Officer Roth informed Ms. Jiron that they were just there to check on her children and, prior to entering the apartment, the officers' overall conduct was professional.

Nor was the officers' show of force gratuitous. Although Officer Carbajal yelled "police department!" at one point, given the need for the officers to allay any concerns an occupant might have (and based on Ms. Jiron's statements, that she did have) about opening the door to a stranger in the middle of the night, this was not flagrant misconduct. Further, although both officers did unholster their guns when the door was opening (the time during which what they might face was most unpredictable), they holstered their guns as soon it became apparent Ms.

Jiron presented no danger. In short, the officers appeared to have been acting in good faith. *See Strief*, 136 S. Ct. at 2063 (finding the officer "made two good faith mistakes").

Whether well-intentioned or not, however, the officers' interaction with Ms. Jiron was much different than an interaction Ms. Jiron might have had with a member of the public knocking on her door or with a social worker who stopped by during the day to check on her children. As the Tenth Circuit noted in *Fox*, "purposeful and flagrant misconduct is not limited to situations where police act in an outright threatening or coercive manner." *Fox*, 600 F.3d at 1261 (internal quotations and citation omitted). In *Fox*, a woman stopped her car in the street to address two police officers walking towards her home. 600 F.3d at 1255. The woman rolled down her window and asked what was going on. *Id.* This was a consensual encounter, but one of the officers transformed it into a seizure when he identified himself as police, displayed his badge, entered Ms. Chiles's car, directed her to drive to a nearby parking lot, and never advised her that she was free to leave. *Id.* at 1258. The two then had a conversation where the officer asked for a driver's license and whether there were any illegal substances in the car. *Id.* at 1256-57. The officer informed Ms. Chiles he was more interested in her husband than her, and asked whether there was anything illegal in the house she and her husband were living in. She said no. At that point, the officer asked Ms. Chiles for consent to search the home, which she gave. *Id.* at 1257. "Throughout the encounter, the officers spoke in a calm, conversational tone with Ms. Chiles. They never displayed their weapons, nor did they make any explicit threats or promises." *Id.* at 1256. Thus, while relevant, it is clear from *Fox* that analysis of the third factor goes beyond whether police acted professionally and with good intentions during an encounter.

For instance, it is significant that the officers had "no right whatsoever to detain" Ms. Jiron inside her home. *Id.* at 1261. Defendants here do not argue exigent circumstances or claim

they had a warrant. In addition, rather than simply knocking on the door in a manner similar to what any member of the public might have done, the officers acted under color of authority. Although the knocking and announcing of police may not have amounted to a seizure, it amounted to a display of authority. *See* Carabajal Aff., Doc. 59-1 ¶ 4 ("After knocking we would announce 'police department' so the occupants would know that we were not just persons trying to harass them, but on official police business."); Roth Aff., Doc. 59-2 ¶ 5 ("Over the next two minutes, Officer Carabajal and I then each knocked on the door twice and once on the front windows on either side of the door in an attempt to wake any sleeping persons and announced ourselves as officers by stating 'police department' in order to communicate that we were there on legitimate business."). This indicates that the officers' purpose in approaching the apartment was *not* a consensual knock-and-talk investigation, in which police officers have *no more right* to intrude on sleeping persons than do general members of the public.

After Ms. Jiron came to the front door, Officer Roth's command for Ms. Jiron to open the door, his response to Ms. Jiron's question about why she had to open the door ("for the police"), his opening the outer metal security door farther than Ms. Jiron chose to open the door on her own, and admonishment for not answering the door sooner indicates Officer Roth did not intend to conduct a consensual knock-and-talk investigation—the subject of such investigation always being free to decline to answer the door or speak to the police. At no time did either officer inform Ms. Jiron that she was free to decline to speak to them and go back to sleep. Nor, at 1:00 a.m., was this done in full view of the public. These circumstances indicate that the officers detained Ms. Jiron "with a quality of purposefulness." *Fox*, 1262 (internal quotation marks omitted). Based on *Fox*, the Court concludes that this third factor also weighs in favor of Plaintiffs.

Considering the three *Brown* factors in the aggregate, the Court finds Defendants have failed to satisfy their burden of establishing a break in the causal connection between Ms. Jiron's illegal seizure and her consent to search. *See Reeves*, 524 F.3d at 1170 ("This court's case law makes clear that the government bears the burden of demonstrating both voluntariness and a break in the causal connection.").[19] Assuming Ms. Jiron stood aside to let the officers enter and thereby impliedly consented to their entrance, drawing all reasonable factual inferences in favor of Plaintiffs, Ms. Jiron's consent was not valid.

      B.      <u>The law is clearly established.</u>

As the proceeding discussion makes clear, the law is clearly established that a consent immediately following an illegal detention is invalid unless the government demonstrates both voluntariness and a break in the causal connection. *Fox* and *Strieff* clearly establish that a small amount of time (mere minutes) between an illegal seizure and the consent weighs against finding a break in the causal chain. Further, Defendants argue that the calm conversation between Ms. Jiron and Officer Roth, during which the officers' weapons were holstered, is an intervening circumstance that cures the taint of any illegal detention.[20] As set forth above, however, whether a consent to search has been tainted by an illegal seizure does not turn on how polite, calm, or

---

[19] There is a tension between a criminal-law doctrine that places the burden on the prosecution to prove a set of factors, and the civil doctrine of qualified immunity which places the burden on the plaintiff to establish that the government violated a clearly established constitutional right. When discussing whether the government officials violated the Fourth Amendment under prong one of the qualified immunity test, the Court has assumed it is the government's burden to show that the taint of the illegal seizure dissipated before Ms. Jiron consented to the search of her home. But when discussing whether the law is clearly established under prong two, it might be Plaintiffs' burden to show that no reasonable officer could have believed Ms. Jiron's consent was untainted. The Court concludes that *Fox* so closely governs this case that it satisfies Plaintiffs' burden, regardless of the exact contours of that burden.

[20] Defendants make this argument in the alternative; they do not concede that there was an illegal detention.

professional the officers acted. Part of the reason for this relates to the distinction between the voluntariness inquiry and the attenuation inquiry.

As the Tenth Circuit stated in *Fox*:

Although the two requirements will often overlap to a considerable degree, they address separate constitutional values and they are not always coterminous. We require the government to demonstrate that any taint of an illegal search or seizure has been purged or attenuated not only because we are concerned that the illegal seizure may affect the voluntariness of the defendant's consent, but also to effectuate the purposes of the exclusionary rule.

*Id.* at 1257. How polite, calm, and professional police officers act bears more heavily on whether a person's consent was voluntary than it does on the more sterile inquiry of whether an illegal seizure is attenuated from a subsequent consent to search. Further, the Tenth Circuit has made clear that a person's voluntary consent cannot itself constitute an intervening circumstance. *Id.* at 1260 ("The district court clearly erred in suggesting Ms. Chiles's voluntary consent itself was an intervening circumstance. Her consent is not in itself an intervening event which could remove the taint of the prior illegal seizure. Under the facts presented, there was no basis for finding an intervening circumstance.") (internal citation omitted).

In considering whether the facts in *Fox* are analogous enough to the facts in the present case to place Defendants on clear notice that their search was unconstitutional, the Court does acknowledge that the police officer in *Fox* entered Ms. Chile's car whereas the officers here remained outside Ms. Jiron's house until she allegedly provided implied consent for them to enter. Nonetheless, *Fox* presents many circumstances similar to the present case. An illegal seizure occurred; a calm conversation took place; and the person allegedly consented to a search of the home. Moreover, aggravating factors absent in *Fox* exist in the present case. In *Fox*, the officers "never displayed their weapons, nor did they make any explicit threats or promises." *Id.* at 1256. Defendants here not only displayed their weapons, but Officer Roth pointed his in Ms.

Jiron's direction for at least a second when she first saw the officers. And, while they made no "threats or promises," Officer Roth did issue Ms. Jiron a direct order to open the door, told her "for the police" when she asked why she had to open the door, and opened the outer metal security door wider than Ms. Jiron chose to open it on her own.

Qualified immunity is not "a scavenger hunt for prior cases with precisely the same facts." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 992 (10th Cir. 2020) (internal quotation marks omitted). The more relevant inquiry is whether the law put officials on fair notice that the described conduct was unconstitutional. *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). Factual distinctions in prior cases that do not bear on the relevant legal inquiry are "distinction[s] without difference for purposes of our clearly-established-law analysis." *Corona v. Aguilar*, 959 F.3d 1278, 1287 (10th Cir. 2020). The difference between an illegal detention in a person's car and an illegal detention on the threshold of one's home (particularly given the additional aggravating factors in the present case) provides an insufficient basis to distinguish *Fox* from the present case for qualified immunity purposes. The Court concludes that *Fox* places all reasonable officers on notice that the search in this case would be unconstitutional because nothing occurred between the illegal seizure and the search that would have dissipated the taint of the illegal seizure.

C.   Alternatively, Any Voluntary Consent Was Withdrawn While The Officers Were In The Home.

Ms. Jiron argues, in the alternative, that she withdrew her consent once the officers started searching the bedrooms and waking her children. Jiron Aff., Doc. 69-2 ¶ 4(m) ("[W]hen the officers went to start looking at my kids I started complaining because I really did not want them to do this to my kids. I told the officers I did not want them to be there in my house and I did not want them to search my kids."). Both officers had their microphones off during the time

37

Ms. Jiron allegedly made these statements and so the label camera videos neither confirm nor dispel Ms. Jiron's allegations. Nowhere in its Reply, however, do Defendants dispute that Ms. Jiron made these statements (*see generally* Doc. 72 at 2-4) and, even if they did, the Court does not assess credibility at this stage and must draw all reasonable factual inferences in favor of Plaintiffs. Thus, the Court accepts Plaintiffs' allegations as true for purposes of this Order and focuses on Defendants' argument that "Ms. Jiron did not 'unequivocally' withdraw consent by asking the officers to leave; instead, she said that she did not 'want' them there." Doc. 72 at 12.

No reasonable officer could hear "I don't want you in my home and I don't want you to search my kids" and think that the person is consenting to the officers remaining in that home and searching the children. The Tenth Circuit decision in *Manzanares v. Higdon*, 575 F.3d 1135 (10th Cir. 2009), clearly establishes this conclusion. There, based on the defendant officers' acknowledgment that the plaintiff "'didn't want us there anymore,'" the Tenth Circuit found there could be no "legitimate dispute" that this meant consent was withdrawn. *Id.* at 1143.

Further, drawing all reasonable factual inferences in favor of Plaintiffs, Officer Roth threatened to arrest Ms. Jiron in front of her kids if she continued to object to the presence of the officers in her home and to their search of her children. This threat caused Ms. Jiron to cease her protestations. Defendants' argument that Ms. Jiron did not say enough to withdraw her consent is undermined by evidence that Officer Roth prevented her from saying more. Considering all of these circumstances, in the alternative to its finding of invalid consent, the Court agrees with Ms. Jiron that even if she initially provided valid consent for the search, she thereafter withdrew that consent.

IV.     **The Court Grants Summary Judgment On Plaintiffs' First Amendment Retaliation Claim.**

Plaintiffs allege in Count III of their complaint that Officer Roth retaliated against Ms. Jiron for exercising her First Amendment rights in violation of the law, specifically by instructing her to stop objecting to the officers' presence in her home, or face arrest in front of her children. Doc. 4 (Amended Complaint) ¶ 60.

First Amendment retaliation claims are generally brought in the public employment context. To assert a claim for First Amendment retaliation outside that context, a plaintiff must establish that: (1) the plaintiff was engaged in constitutionally protected activity; (2) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000).

Defendants here do not challenge the first element. Instead, they focus their arguments on the second and third elements. Addressing the second element, they argue that one threat to arrest a person does not rise to the level of conduct "that would chill a person of ordinary firmness from continuing to engage in [protected] activity." Doc. 59 at 29. Addressing the third element, they argue "Ms. Jiron has alleged no specific facts to demonstrate the threat of arrest was directly related to her exercise of a constitutionally protected right and not some other purpose." Doc. 59 at 22. The Court disagrees with Defendants, but ultimately finds the law is not clearly established on the second element.

A.     <u>Officer Roth Violated The First Amendment.</u>

To recap, the police officers claim that Ms. Jiron consented to the officers' presence in her home. The video shows that when the officers talked amongst themselves while in the home,

they turned off their microphones. The microphones remained off when Ms. Jiron complained

about the officers' presence in her home and searching her children. Plaintiffs do not dispute that

Ms. Jiron was "agitated" at this time. Doc. 69 at 10, Plaintiffs' Response to UMF 19. In response

to Ms. Jiron, Officer Roth turned his microphone back on and started shouting at Ms. Jiron:

> Officer Roth: Change your tone, hey why don't you change your tone!
>
> Ms. Jiron: Because I don't think I—
>
> Officer Roth: All right? Why don't you take a chill pill for a second!
>
> Ms. Jiron: Because I don't think I need to.
>
> Officer Roth: Because if you want to have a shouting match, I can have that with you.
>
> Ms. Jiron: I don't think I need to.
>
> Officer Roth: You understand that? All right, yeah. You *do* need to, okay?
>
> Ms. Jiron: No, I do not.
>
> Officer Roth: 'Cause if you want me to arrest you right now for interfering with the investigation of—
>
> Ms. Jiron: I'm not interfering [unintelligible].
>
> Officer Roth: —child abuse, I can do that, okay, if you want to go in handcuffs in front of your kids, I can do that, I can make that happen, okay? Otherwise, change your attitude!

Roth Body Camera, Ex. 4 at 6:05-6:30.

Defendants argue that a single threat to arrest someone—rather than an actual retaliatory

arrest—is not a constitutionally cognizable harm. Doc. 59 at 21-22. The Court disagrees. The

Supreme Court has held that "the threat of invoking legal sanctions and other means of coercion,

persuasion, and intimidation" curtails the freedom of speech just as effectively as an actual

sanction. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963); *see also Evans v. Fogarty*, 241

F. App'x 542, 559 (10th Cir. 2007) ("threats of official sanctions aimed at discouraging

protected activity can form the basis of a constitutional violation").

Numerous courts of appeal have found that a mere threat of official or legal action qualifies as constitutionally actionable harm. In *Van Deelen v. Johnson*, the Tenth Circuit held that "allegations of physical and verbal intimidation, including a threat by a deputy sheriff to shoot [the plaintiff] if he brought any more tax appeals, would surely suffice under our precedents to chill a person of ordinary firmness from continuing to seek redress for (allegedly) unfair property tax assessments." 497 F.3d 1151, 1157 (10th Cir. 2007). In *Zieper v. Metzinger*, the *mere presence* of multiple police officers indicated "that there might be legal consequences if [the plaintiff] failed to accede to the government's request" to curtail his speech (but the court also found this principle was not clearly established law). 474 F.3d 60, 67 (2d Cir. 2007). The Seventh Circuit, in *Backpage.com, LLC v. Dart*, found a First Amendment violation when a sheriff sent a cease-and-desist letter to credit card companies, just because the sheriff *cited* a criminal statute (with no accompanying explicit threat to prosecute them under said statute). 807 F.3d 229, 232 (7th Cir. 2015). In *Capp v. County of San Diego*, the Ninth Circuit held that "the threat of losing custody of one's children would ordinarily chill First Amendment activity." 940 F.3d 1046, 1058-59 (9th Cir. 2019). And threats to release private emails with embarrassing information were sufficient to state a claim of First Amendment retaliation in *Noonan v. Kane*, 698 F. App'x 49, 53-54 (3d Cir. 2017).

Of course, as Defendants here stress, there is a point at which threats of official action are too de minimis to be actionable as First Amendment retaliation. For example, in *Evans v. Fogarty*, the panel briefly discussed a threat to have a nursing home investigated for fraudulent billing. 241 F. App'x 542, 559 (10th Cir. 2007). Although the panel did not reach the issue, it stated it was "skeptical" such a threat qualified as adverse regulatory action. *Id.* For the Third Circuit, a threat to move for sanctions in a pending matter in litigation did not qualify, as the

"quantum of governmental authority brought to bear was minimal." *Mirabella v. Villard*, 853 F.3d 641, 651 (3d Cir. 2017) (internal quotation marks omitted). Likewise, the Ninth Circuit held it is not clearly established, for purposes of qualified immunity, that a threat to call immigration enforcement is of sufficient chilling effect. *Doe v. Pasadena Unified Sch. Dist.*, 810 F. App'x 500, 503 (9th Cir. 2020).

The threat to arrest a mother in her own home in front of her children in the middle of the night, however, is different than the threats made in these cases. The threat to Ms. Jiron is more akin to the threat of prosecution or other official legal sanction than threats to have an investigation conducted, to move for sanctions in a pending court case, or to call immigration officials. An arrest carries indisputable official consequences on its own—the restriction of physical liberty. The other types of harm that are found to be de minimis in the cases above only *might* lead to legal consequences. Only if the nursing home investigators, the judge presiding over the litigation, or the immigration officials ultimately sided with the official making the threat would legal consequences follow. Here, by contrast, Officer Roth had the present ability to arrest Ms. Jiron.

Defendants next argue that the threat of arresting Ms. Jiron in front of her children was not actionable because it was only one threat, rather than multiple threats. Doc. 59 at 21-22. Accepting Defendants' argument would give police officers who obtain consent to perform a search a perverse incentive to threaten, immediately after a person provides consent, to arrest the person should she say another word before the search is completed. In so threatening (as long as the threat is only made once), police could greatly reduce the number of withdrawn consents while still staying within the parameters of the First Amendment. Take the present case, for instance (drawing all reasonable factual inferences in favor of Ms. Jiron). When Officer Roth

threatened to arrest Ms. Jiron if she continued her protestations, Ms. Jiron faced the dilemma of remaining silent and allowing a warrantless search of her children and her home, or objecting and terminating the search at the cost of getting thrown in jail.

Further, the one-threat-is-not-enough rule Defendants advocate places a person who wants to speak but does not want to disobey a police officer and go to jail in a difficult position. If, in response to only one threat, the person obeys the police officer and stops talking, she will be legally barred from vindicating her First Amendment right through a § 1983 action. A plaintiff who wants to vindicate her First Amendment rights would have to disobey a direct order from the police officer and risk going to jail if the police officer decides to make good on his threat. Such a rule would be anathema to the ideals of the First Amendment and an orderly society in which citizens are generally encouraged to obey police commands the first time police give those commands.

Nor do the cases Defendants cite stand for the proposition that, if police threaten a person for trying to revoke her consent to search, the police do not infringe on her constitutional rights as long as they only make the threat once. In the first case Defendants cite, a man named Dale McCormick decided to, from his vantage point on a public sidewalk, protest a traffic stop a police officer made of another individual at 2:45 a.m. *McCormick v. City of Lawrence*, 253 F. Supp. 2d 1172, 1182 (D. Kan. 2003), *aff'd*, 99 F. App'x 169 (10th Cir. 2004) (affirmed by the Tenth Circuit only with respect to other grounds raised by other defendants). After the police officer threatened to arrest Mr. McCormick, he went home, only to return ten minutes later when police twice more threatened to arrest him unless he stopped his oral challenge to the police stop. *Id*. The district court concluded that the three threats should be analyzed together rather than separately. *Id*. at 1192. It then stated, "[p]ut another way, the court would conclude that any

injury Mr. McCormick suffered from the 2:45 a.m. threat of arrest standing alone was de minimis because he was back protesting ten minutes later." *Id.* This language implies that had Mr. McCormick stayed home rather than come back after the first threat, one threat might have been enough.[21] More importantly, in concluding that the "collective effect" of these three threats should be considered, the district court never intimated that a single threat to arrest provides an insufficient foundation for a First Amendment retaliation claim. *See id.* To the contrary, using the word "threat" rather than the word "threats," the district court held that "the *threat* of arrest by a police officer is exactly the sort of act [harm] that would deter a person of ordinary firmness from exercising his or her First Amendment right to orally challenge that officer." *Id.* at 1197 (emphasis added).

The other case Defendants cite, *Brogan v. Tunkhannock Township*, also presents facts different than those in the present case. 302 F. Supp. 3d 670, 683 (M.D. Pa. 2018). The district court did note, like here, it was bound to view the facts in the light most favorable to the plaintiff and so accepted as true the plaintiff's allegations that the defendant police officer threatened to arrest him if he continued to call the police station. *Id*. But the district court then looked to the actual exchange between Mr. Brogan and the police officer and concluded that it could not "sustain a claim of constitutional dimension" and, therefore, the officer's speech was "de

---

[21] As the second case Defendants rely on recognizes, whether an act is retaliatory is an objective question. *Brogan v. Tunkhannock Township*, 302 F. Supp. 3d 670, 683 (M.D. Pa. 2018). Even so, the district court in *Brogan* concluded that how a plaintiff acts in a particular case is nonetheless relevant because the plaintiff's actions can provide "one indication that an objective person would not have been deterred by the Officer's statement." *Id.* at 684. Although the district court in *McCormick* did not explain why it considered Mr. McCormick's response to the officer's threat a crucial factor, it clearly did. Unlike *McCormick*, however, in the present case Officer Roth's threat *did* cause Ms. Jiron to cease her protests. Thus, even if the Court were to look to the non-binding decision in *McCormick* for guidance, a factor the district court considered crucial in *McCormick* (the threat's ineffectiveness) is missing in the present case.

minimis." *Id*. 683, 683 n.12 (quoting magistrate judge's underlying opinion). Specifically, the officer simply "advised Brogan not to point his finger at him, and admonished him to refrain from placing meritless 911 calls in the future, since he could be cited for such conduct." *Id*. at 683 n.12. The district court agreed with the magistrate judge who wrote the underlying opinion that this exchange "constituted nothing more than criticism, and verbal reprimands, actions which typically are considered de minimis and do not rise to the level of conduct which would deter a person of ordinary firmness from asserting his rights." *Id*.

In contrast to the plaintiffs in *McCormick* and *Brogan* who were not initially deterred by a police officer's threat to arrest them if they did not cease their speech, Officer Roth's threat to Ms. Jiron indisputably chilled her speech. She stopped telling the officers that she did not want them there and, as a result, the officers continued to search her apartment.

Further, in contrast to the exchange the district court in *Brogan* considered de minimis, at the time Officer Roth threatened Ms. Jiron he had already illegally seized her (by ordering her to open her door) and entered her home. He was yelling at her in her own home in the middle of the night and threatening her that if she did not "change her tone" and/or "change her attitude," he would handcuff her and arrest her in front of her children. The Court has no trouble concluding that Officer Roth's threat to arrest and handcuff Ms. Jiron in front of her children (taking her out of her home and to jail at 1:00 a.m.) was sufficiently severe to deter a person of ordinary firmness from continuing to object to police officers' presence in that home, and that it did (at least when viewing the facts in the light most favorable to Plaintiffs) in fact chill Ms. Jiron's speech.

Regarding the third element of a First Amendment retaliation claim—whether the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of

constitutionally protected conduct—Defendants argue, "Ms. Jiron has alleged no specific facts to demonstrate the threat of arrest was directly related to her exercise of a constitutionally protected right and not some other purpose." Doc. 59 at 22. Because the officers had their microphones off during the time Ms. Jiron was "agitated" (Doc. 69 at 10, Plaintiffs' response to UMF 19), the audio portion of the recording does not indicate how "agitated" Ms. Jiron became. The video portion does not indicate that Ms. Jiron physically threatened the officers in any way and Defendants make no allegation that Ms. Jiron engaged in any physically threatening conduct. Although it is possible that Officer Roth's decision to turn on his microphone and start yelling at Ms. Jiron might have been in response to her becoming "agitated" rather than in response to content of her speech,[22] the Court at this stage must draw all reasonable factual inferences in favor of Ms. Jiron. Defendants do not dispute that Ms. Jiron was objecting to what the police were doing just before Officer Roth turned on his microphone. Drawing all reasonable factual inferences in Ms. Jiron's favor, a reasonable jury could conclude that Officer Roth's threat to arrest Ms. Jiron was in response to her objecting to the officers' presence in her home and to their search of her children.

B.    Plaintiff Has Not Cited, And The Court Is Unaware Of, Controlling Precedent Or A Robust Consensus Of Cases Sufficient To Satisfy The Second Prong Of Qualified Immunity.

Much more difficult than the question of whether Officer Roth's conduct was constitutional is the question at prong two of the qualified immunity analysis. The Court begins its analysis by noting that Ms. Jiron has not argued "that the officer[s'] conduct was so obviously unconstitutional that it is not necessary for the plaintiff[s] to show clearly established existing

---

[22] The parties do not address whether Ms. Jiron acting "agitated" in her own home would constitute protected speech and so neither does the Court.

law prohibiting such conduct." *Estate of Ceballos v. Husk*, 919 F.3d 1204, 1218 (10th Cir. 2019). Following the Tenth Circuit's lead in *Estate of Ceballos*, the Court does not address this potential argument because Plaintiff has not asserted it. *Id*. Instead, the court limits its analysis to reviewing precedent Plaintiff has cited and precedent within the Court's knowledge to determine whether this precedent is sufficient to put any reasonable officer on notice that his or her conduct was illegal.

In support of their argument, Plaintiffs cite to a single district court case, *McCormick v. City of Lawrence*. Doc. 69 at 20. As discussed above, a single district court case cannot clearly establish the law for purposes of defeating qualified immunity.

Further, the Court disagrees with *McCormick*'s apparent assumption that it is a defendant's burden to argue that the law is not clearly established. 253 F. Supp. 2d at 1199 (finding that threats of retaliatory arrest were unconstitutional and then denying qualified immunity because the defendants in that case failed to argue the law was not clearly established). This conflicts with Tenth Circuit cases repeatedly holding that the plaintiff bears the burden of defeating both prongs of the qualified immunity test, *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009), and also that "the *plaintiff* bears the burden of citing to us what he thinks constitutes clearly established law," *Quinn v. Young*, 780 F.3d 998, 1013 (10th Cir. 2015) (internal quotation marks and alteration omitted). *See also Cox v. Glanz*, 800 F.3d 1231, 1245-46 (10th Cir. 2015) (declining to find forfeiture even where a defendant does not brief the clearly-established prong of the qualified immunity test).

Although it is a plaintiff's burden to cite clearly established law, the Supreme Court has instructed that a reviewing court should "use its full knowledge of its own and other relevant precedents," *Elder v. Holloway*, 510 U.S. 510, 516 (1994) (internal quotation marks and

alterations omitted). Although the Supreme Court's instruction was directed to appellate courts, the rationale for this instruction applies equally to trial courts. Therefore, in addition to the one district court case Defendant cites as providing clearly established law, the Court will consider its independent knowledge of clearly established law[23] in asking whether controlling precedent or a robust consensus of cases existed in 2019 to clearly establish that a single[24] threat of arrest was sufficient to show a constitutional-level chilling effect. The only controlling precedent of which the Court is aware that comes close to doing so is *Van Deelen v. Johnson*.

In *Van Deelen*, the Tenth Circuit held that "a reasonable government official should have clearly understood at the time of the events at issue that physical and verbal intimidation" violates the First Amendment. 497 F.3d at 1159. But *Van Deelen* addressed multiple acts of intimidation: deliberating bumping into plaintiff's chair and shoulder at a public meeting, placing a hand on a holstered gun with menacing looks, scowling and staring at the plaintiff the entire time, poking plaintiff's chest and telling him to leave or "I might have to shoot you." *Id.* at 1154. The fact that such conduct is clearly established to be retaliatory in the Tenth Circuit does little to put Defendants on notice that a single shouting match, even one that includes a threat to arrest a plaintiff, is illegal.

In sum, the parties have cited no controlling precedent or robust consensus of cases, and the Court has found none, that would have put Officer Roth on notice that a single threat to arrest

---

[23] Because the Court ultimately concludes no such clearly established law exists, there is no need to have Defendants provide supplemental briefing related to cases the Court independently considers.

[24] Plaintiffs contend that "the factual record shows that Defendant Roth repeatedly threatened to arrest Ms. Jiron after she spoke up about the Defendants' behavior." Doc. 69 at 20 (footnote omitted). There is no support for this argument. Plaintiffs' evidence for their contention is the single conversation in which Officer Roth threatened to arrest Ms. Jiron. *See id.*

someone is retaliatory conduct sufficient to violate a person's First Amendment rights. The Court, therefore, grants qualified immunity on this claim.

## V. The Court Denies Summary Judgment On The Remaining Claims.

Defendants move for summary judgment on Count I, Plaintiffs' state-law claims of unlawful search and seizure and First Amendment retaliation, on the grounds that state law does not meaningfully differ from federal law. Doc. 59 at 8 n.1 & 21 n.3. The Amended Complaint does not elaborate on the actions that supposedly violated state-law prohibitions against unreasonable searches and seizures. *Cf.* Doc. 4 ¶ 44 ("Defendants violated [Plaintiffs'] rights by searching and seizing the Plaintiffs without legal cause."). To the extent this claim is based on the allegedly illegal search of peering into the windows of the apartment before Ms. Jiron opened her door, partial summary judgment is granted to Defendants for the reasons stated *supra*, Discussion Part I.

Otherwise, the Court has found that the Defendants violated federal law in several respects. Unlike Plaintiffs' federal claims, however, the doctrine of qualified immunity plays no part in analyzing Plaintiffs' state claims. New Mexico has no section 1983 equivalent for enforcing provisions of the state constitution. *Barreras v. State of New Mexico Corr. Dep't*, 2003-NMCA-027, ¶ 24, 62 P.3d 770, 776. Therefore, "the courts of this state have consistently declined to permit individuals to bring private lawsuits to enforce rights guaranteed by the New Mexico Constitution." *Id.* Instead, litigants must identify "an express waiver of immunity under the [New Mexico] Tort Claims Act" ("NMTCA"). *Id.* The NMTCA expressly waives immunity for constitutional torts committed by law enforcement officers, as set forth in the Amended Complaint. Doc. 4 ¶ 49. As a result, given Defendants' acknowledgment that state law does not meaningfully differ from federal law, the Court denies Defendants' motion for summary judgment related to Plaintiffs' state law claims where the Court has found Defendants to have

violated the federal constitutional counterpart to the state law claim. In other words, except as otherwise noted, the Court denies Defendants' motion for summary judgment as to the state constitutional claims set forth in Count I.

Count I also contains state-law claims of battery based on Officer Carabajal's touching of the children (paragraph 48 of the Amended Complaint, brought only against Officer Carabajal). Doc. 59 at 24-25. Defendants seek summary judgment on these claims, arguing that Ms. Jiron consented to Officer Carabajal's request by her behavior when she led Officer Carabajal to the children in their bedrooms and watched without protest as she examined them. *Id.* at 25. Although it is true that consent is a defense to the state-law tort of battery,[25] the very case cited by Defendants demonstrates that this is a question for the jury unless the facts and inferences are "overwhelmingly in favor of the moving party." *Young v. Gila Reg'l Med. Ctr.*, No. A-1-CA-36474, 2020 WL 3006699, at *10 (N.M. Ct. App. June 4, 2020). The Court does not find the issue "overwhelming" in Defendants' favor, given the facts and circumstances of Defendants' entry into Plaintiffs' home as discussed above.

Similar reasoning applies to Defendants' request for summary judgment on Plaintiffs' state law claims for trespass, on the grounds that Ms. Jiron supposedly consented to entry into her home and never withdrew it. Doc. 59 at 25-26. Defendants, in other words, move for a ruling that no reasonable jury could find a lack of consent. The Court has addressed the consent issue above; viewing the facts in the light most favorable to Plaintiffs, the Court concludes that any implied consent Ms. Jiron provided was tainted by the illegal seizure and, even if it were not, a

---

[25] The parties do not brief, and so the Court does not address, whether Officer Carabajal's actions meet the elements of a battery claim under state law.

reasonable jury could conclude that Defendants trespassed when they remained in the house after Ms. Jiron withdrew her consent.

Finally, Defendants move for summary judgment on Count IV, failure to intervene. They argue that because there is no underlying constitutional violation, there can be no claim for failure to intervene. Doc. 59 at 23. They make no other arguments, and so the Court does not address any other arguments. Because the Court has found an underlying constitutional violation it denies the motion. Similar reasoning applies to Defendants' request for summary judgment on Plaintiffs' negligent supervision and training claim. Doc. 59 at 26. Defendants argue only that this claim is unsuccessful because there is no underlying violation of rights. *Id.* Having rejected this argument, the Court declines to grant summary judgment on the derivative claim.

## CONCLUSION

Defendants' Motion for Summary Judgment, Doc. 59, is GRANTED IN PART and DENIED IN PART.

The Court GRANTS summary judgment to Defendants on Plaintiffs' state and federal claims that Defendants conducted an illegal search by entering into the curtilage of the home and looking through the front windows before Ms. Jiron opened the door to her home (paragraphs 55(a) and (b) of the Amended Complaint).

The Court GRANTS summary judgment to Defendants on Plaintiffs' claim of First Amendment retaliation under the federal Constitution (Count III of the Amended Complaint).

The Court DENIES summary judgment to Defendants on the balance of Plaintiffs' claims.

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE